IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**LINDA K. RAGLAND,**

    **Plaintiff,**

vs.    No. **08cv0741 DJS**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

# MEMORANDUM OPINION

**THIS MATTER** is before the Court on Plaintiff's (Ragland's) Motion to Reverse or Remand Decision of the Commissioner **[Doc. No. 13]**, filed December 23, 2008, and fully briefed on March 17, 2009. On August 24, 2007, the Commissioner of Social Security issued a final decision denying Ragland's claim for disabled widow's benefits. Ragland seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be **DENIED**.

## I. Factual and Procedural Background

Ragland, now sixty years old (D.O.B. May 14, 1948), filed her application for disabled widow's benefits on November 4, 2004, alleging disability since February 17, 2000[1] (Tr. 61), due to depression, heart problems, migraine headaches, hypertension, tachycardia, arthritis,

---

[1] Ragland filed a prior application on July 9, 1998. The ALJ who presided over that claim issued an unfavorable decision on February 16, 2000. Ragland did not appeal the denial and thus the ALJ's decision is final. Because Raglands' spouse died on July 9, 1994, Ragland must establish that she was disabled on or before July 31, 2001.

thyroid problems, and problems with her right foot (Tr. 67).  In order to be entitled to disabled widow's benefits, Ragland must establish that her disability began on or before July 31, 2001, seven (7) years after the death of her spouse.  Ragland has an Associate Degree.  The Commissioner's Administrative Law Judge (ALJ) found Ragland had no past relevant work.  Tr. 20.  On August 24, 2007, the ALJ denied benefits, finding Ragland was not disabled as she retained the residual functional capacity (RFC) to perform a limited range of light work but there were jobs that existed in significant numbers in the national economy that she could perform.  *Id.*  Ragland does not challenge this finding.  The ALJ further found Ragland's "statements concerning the intensity, persistence and limiting effects of [her alleged symptoms] were not entirely credible."  Tr. 18.  On June 10, 2008, the Appeals Council denied Ragland's request for review of the ALJ's decision.  Tr. 6.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Ragland seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant

medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

"'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  The court "may not 'displace the agenc[y]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zolantski*, 372 F.3d at 1200).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Ragland makes the following arguments: (1) the ALJ neglected to fully and fairly develop the record when he failed to supplement the hearing record with a previous hearing record; (2) the ALJ erred in finding that she was not disabled through August 24, 2007, without fully and fairly developing the record and factoring her advanced age; (3) the ALJ improperly discounted her credibility on the basis of her daily activities.

## A.  Failure to Develop the Record

 "Although a claimant has the burden of providing medical evidence proving disability, the ALJ has a basic duty of inquiry to fully and  fairly develop the record as to material issues." *Baca v. Dep't of Health and Human Servs.,* 5 F.3d 476, 479-80 (10th Cir. 1993). "This duty exists even when the claimant is represented by counsel." *Id.*

Ragland contends the ALJ's failure to supplement the record with Dr. Sabita Sengupta's September 20, 1998 medical consultative evaluation and Ragland's previous claim file was reversible error.[2]  Ragland argues that the medical records in her previous claim file were necessary to prove she was disabled on or before July 31, 2001.  Ragland maintains she was diagnosed with mitral valve prolapse with tachycardia, hypothyroidism[3], hypertension, peptic ulcer disease, cervical radiculopathy, and osteoarthritis prior to July 31, 2001.

A review of the record indicates Ragland's medical records from 1986 through 2001 were before the ALJ.  *See* Tr. 120-121,140-162, 250- 326.  These records support the ALJ's finding that Ragland was not disabled during the adjudicated period of time, February 17, 2000 through July 21, 2001.  The record also contains medical records through 2007.

Ragland's medical records indicate Dr. Sambaiah Kankanala diagnosed her with mitral valve prolapse that was adequately controlled with medication.  *See e.g.* Tr. 326 (Dr. Kankanala's medical notes dated 9/5/1986), Tr. 322-323 (medical records dated 9/11/1986 from Lea Regional Hospital– Holter Report finding "essentially normal Holter monitor with mild sinus tachycardia occurring); Tr. 320 (Dr. Wells, cardiologist– medical notes dated 10/19/1987, finding normal resting EKG and normal submaximal stress test and good exercise capacity); Tr. 294 (Dr. Kankanala – medical notes dated 6/11/1993, finding mitral valve prolapse and directing she return in two weeks); Tr. 299-300 (Dr. Overlie– 5/28/1993 medical notes, finding "mitral valve prolapse and some dysrhythmias" and recommending "she should be managed

---

[2] Counsel for Ragland indicates in his brief in support of the motion to remand that "a true copy of the report by Dr. Sengupta, Exhibit 4F, is attached hereto and incorporated by reference."  Mem. Br. Supp. Mot. to Remand at 9 n.1.  However, exhibit 4F was not attached.

[3] Although Ragland claims she suffered from hyperthyroidism in her motion to remand, the record indicates she was diagnosed with hypothyroidism.  *See e.g.* Tr. 273.

conservatively"); Tr. 285 (Dr. Overlie– 11/17/1994 medical notes, finding "she is doing well and should stay on the same medications. I will see her back in one year."); Tr. 265 (Dr. Overlie– 11/28/1995 medical notes, EKG and chest x-ray normal; "doing well and needs to stay on the same medication, will see her back in six months"); Tr. 263 (Dr. Overlie– 11/19/96 medical notes, finding unremarkable cardiac exam and minor non-diagnostic ST-T changes on EKG; increased her Inderal to 80 mg a day, return in a few weeks); Tr. 257 (Dr. Overlie– 2/13/1997 medical notes, finding unremarkable cardiac exam, normal EKG, recommending she stay on same medication and return in three to four months); Tr. 166 (Dr. Kankanala– 3/7/2000 medical notes indicating an unremarkable physical exam and EKG); Tr. 120 (Dr. Overlie– 2/22/2001 medical notes, noting Ragland had not been seen <u>for four or five years</u>, had history of mitral valve prolapse, normal examination, normal EKG, recommending Ragland stay on same medication and follow up in six months).

     The record also indicates Ragland had x-rays of the lumbar spine on February 12, 1990 which showed "no compression fracture, no evidence of spondylolysis, no evidence of spondylolisthesis." Tr. 318. On the same day, Ragland had a normal IVP , normal barium enema. On February 20, 1990, Ragland had a normal ultrsound of the pelvis. Tr. 313. On February 21, 1990, Ragland had a normal gallbladder ultrasound and a normal upper GI series. Tr. 314.

     As to her hypertension, the record indicates that Ragland's hypertension was managed with medication. The Court could not find one elevated BP reading in the record. On September 16, 1986, Dr. Kankanala prescribed Inderal LA 80 mg every day for hypertension. Tr. 326. Ragland returned to Dr. Kankanala after one year on October 14, 1987. Tr. 319. Dr. Kankanala noted, "The patient came for follow up visit after one year. The patient claims that

she wants to have a stress test done but denies any chest pains." *Id.* Dr. Kankanala refilled the Inderal and directed her to return in one month. On February 7, 1990, Ragland returned to Dr. Kankanala. Tr. 317. Dr. Kankanala noted Ragland had returned for a follow up visit "after a number of years." *Id.* A review of the record indicates there is no evidence that Ragland's hypertension was disabling. *See e.g.* Tr. 310 ( 6/17/1991 Dr. Kankanala noted– normal BP, no complaints, doing reasonably well, wants medications refilled); Tr. 310 (11/15/1991 Dr. Kankanala noted normal BP); Tr. 303 (7/9/1992 Dr. Kankanala diagnosed "essential hypertension" and continued on Inderal; normal BP); Tr. 290 (Dr. Overlie– 11/17/1993 medical notes, tapering the dosage of her Inderal from 120 mg to 80 mg due to dizziness).

On July 26, 1993, Ragland complained of "pain in the right side of her neck." Tr. 291. Dr. Kankanala diagnosed her with cervical radiculopathy, ordered c-spine x-rays, and prescribed Motrin 400 mg. three times a day. The cervical spine x-rays showed "degenerative changes at C5-6" and "reversal of curvature in the upper cervical spine, consistent with muscle spasm and there is spur formation which encroaches into the left neuroformaina at C5-6." Tr. 293. On August 2, 1993, Ragland returned for a follow up and reported her neck pain was better. Tr. 292. Dr. Kankanala directed her to continue taking the Motrin and return in three months.

On December 27, 1993, Ragland returned to see Dr. Kankanala with complaints of pain in the upper gastric area. Tr. 239. Dr. Kankanala diagnosed Ragland with peptic ulcer disease, ordered a barium enema, upper GI series, prescribed Zantac 150 mg. twice a day and directed her to return in three weeks. The barium enema was normal (Tr. 287) but the upper GI series indicated a possible small duodenal ulcer (Tr. 288).

On February 4, 1994, Ragland returned for a follow up of her peptic ulcer. Tr. 271. Ragland reported she was doing reasonably well. Dr. Kankanala continued Ragland on Zantac.

Dr. Kankanala directed her to return in three months.  On May 10, 1994, Ragland returned to see Dr. Kankanala for a follow up of her peptic ulcer.  Tr. 271.  On that day, Ragland reported she was doing much better.  Ragland was also experiencing anxiety because her husband was dying with cancer of the colon.  Dr. Kankanala directed Ragland to stay on Zantac and return only as needed.

On June 28, 1994, Dr. James Partin evaluated Ragland.  Tr. 275-278.  Dr. Partin diagnosed Ragland with hypothyroidism.  Dr. Partin ordered an MRI of the head, a CBC, sed rate, MEPII, ANA I, and a urinalysis and urine culture and sensitivity.  Tr. 277.  Dr. Partin also directed Ragland to taper the Inderal.  Dr. Partin also directed Ragland to decrease and then stop the Desyrel and switched her to Zoloft for her depression. The MRI was normal.  Tr. 279.  The TSH (thyroid stimulating hormone) was elevated indicating hypothyroidism.  Tr. 280.  The lab work indicated high cholesterol and high triglycerides.  Tr. 282.  The ANA Profile I was positive.  Tr. 281.  The urinalysis and urine culture were negative.  Tr. 280, 284.

On October 6, 1994, Ragland returned to see Dr. Kankanala.  Tr. 273.  Dr. Kankanala noted Ragland had no complaints.  Dr. Kankanala assessed Ragland with hypothyroidism.

On November 17, 1994, Dr. Overlie sent Dr. Kankanala a letter informing him that Ragland had been in to see him.  Tr. 285.  Dr. Overlie noted Ragland "was newly diagnosed with thyroid trouble."  *Id.*  Dr. Overlie indicated Ragland was taking Synthroid 0.5 mg every day for her problem.  Dr. Overlie opined Ragland was "doing well and should stay on the same medications."  *Id.*

On July 28, 1995, Ragland returned to see Dr. Kankanala for a follow up.  Dr. Ragland assessed Ragland with hypothyroidism and ordered lab work (CBC, UA, Chem 21, TSH) and a mammogram.  Dr. Kankanala directed Ragland to return in one month for her lab results.

On August 25, 1995, Ragland returned for her follow up with Dr. Kankanala. Tr. 267. Ragland reported she was feeling better and had "no complaints." *Id.* Ragland's lab work was normal. Dr. Kankanala assessed Ragland with hypothyroidism and continued her on Synthroid .05 mg every day. On November 19, 2001, Ragland returned to see Dr. Kankanala. Tr. 165. Dr. Kankanala assessed Ragland wit hypothyroidism and directed Ragland to recheck on "an as needed" basis. On May 5, 2003, Ragland returned to see Dr. Kankanala. Tr. 164. On that day, Ragland's "chief complaint" was "prescription refill." *Id.* Ragland reported "no complaints," "doing OK," and "[s]till unable to find a job, no health insurance, [financially] broke." *Id.* Dr. Kankanala's physical examination was unremarkable. Dr. Kankanala refilled Ragland's prescriptions and directed her to return on an "as needed basis."

On April 7, 1999, Ragland returned to see Dr. Kankanala with multiple complaints. Tr. 252-253. Dr. Kankanala noted:

PRESENT ILLNESS:
50 year old, white female came in with numerous complaints. She claims that she has numerous problems, has been denied by the Social Security. She just doesn't feel good. Complaint 1: claims that she is depressed, anxious, nervous, having a lot of family problems. Financially she is broke. Complaint 2: has a lot of arthritis affecting the neck, knees, back and mot all the joints really hurt her. They swell and cannot work. The patient claims that she hasn't worked since 1986. At that time, she worked as a bartender. She has not worked since then. Complaint 3: from time to time she gets pain in the heart. She thinks that this is angina. She did undergo cardiac cath, which did disclose that one of the vessels was tapered, acutely. Otherwise she has no lesions noted. She thinks that she gets the pain in the precordium. From time to time it radiates to the left hand. She has a lot of palpitations. She is weak. The patient claims that she doesn't feel good.

Tr. 252. Dr. Kankanala noted Ragland was still smoking. The physical examination was unremarkable except for the musculoskeletal examination which reflected: "[P]ainful range of motion in the neck. Range of motion is painful in both knees." Tr. 253. Dr. Kankanala assessed Ragland with generalized osteoarthritis, mitral valve prolapse, possible angina pectoris, and

9

anxiety disorder with depression. Dr. Kankanala ordered a CBC, UA, Chem 12, thyroid profile, EKG, and x-rays of the neck and back. Dr. Kankanala prescribed Xanax 0.5 mg twice a day as needed. Ragland was already on Desyrel for her depression.

In 2000, Ragland sought counseling at the Guidance Center of Lea County, Inc. Tr. 149-162. Ragland received counseling services and prescriptions for her depression/anxiety disorder. On July 13, 2000, Ragland's therapist noted: "Linda is experiencing a better quality of life." Tr. 151. The therapist noted Ragland was "stable." On August 7, 2000, the therapist noted Ragland's depression had decreased and under "Plan," listed "maintain stability." Tr. 150. On August 28, 2000, the therapist noted Ragland "continues to improve," wants to work at moving to Colorado to attend school in Durango. Tr. 149. The therapist assessed Ragland as stable and directed she return as needed. On September 14, 2000, Ragland reported she was attending college and doing well. Tr. 147. The therapist assessed Ragland as "Improved/Stable– decreased depression symptoms/no suicidal ideation and homicidal ideation." *Id.* On December 19, 2000, Ragland reported having increased symptoms of depression and reported she had been "turned down by SSI again." Tr. 144. Dr. Monteverde increased her Trazadone to 150 mg. at bedtime and recommended counseling.

On January 23, 2001, Ragland reported she had a 4.0 G.P.A. and was sleeping better. Again, counseling was recommended and Xanax 0.5 mg as needed for anxiety was prescribed. On March 20, 2001, Ragland reported her depression was better and had not yet gone back to counseling because she was too busy. Tr. 142. Dr. Monteverde refilled her prescriptions for Xanax and Trazadone. On May 22, 2001, Ragland reported she was sleeping better and had a good appetite. Tr. 141. Dr. Monteverde noted Ragland was smiling, was cooperative and refilled her prescriptions for Xanax and Trazadone. On June 8, 2001, Ragland had her first

10

appointment with a therapist. Tr. 140. The therapist noted Ragland was open, cooperative, talkative, and had good eye contact.

On May 16, 2002, Ann Thrasher, a therapist, noted, "Linda reports to re-open case– hasn't been seen since last June– still going to school." Tr. 139. Ms. Thrasher also noted Ragland had an appointment to see Dr. Monteverde. Apparently, Dr. Monteverde had previously given Ragland medicine prescriptions for one year. On May 23, 2002, Ragland kept her appointment with Dr. Monteverde. Tr. 138. Ragland reported doing well. Dr. Monteverde assessed Ragland with dysthymic disorder, anxiety, stable bipolar. Dr. Monteverde prescribed Trazadone 100 mg at bedtime. On June 19, 2002, returned to her therapist. Tr. 137. Ms. Thrasher noted Ragland was open, oriented in all four spheres and seemed stable. Ragland completed an Outpatient Clincal Assessment form on that day. Tr. 128-136. Ms. Thrasher assigned Ragland a GAF score of 50. On August 22, 2002, Ragland had her session with Dr. Monteverde. Tr. 127. Ragland reported handling her stress well and was busy with school. Dr. Monteverde assessed Ragland as "mood stable" and prescribed Trazadone 100 mg at bedtime. On October 3, 2002, Ragland called the Guidance Center to report that she was too busy to come to counseling but wanted to continue seeing Dr. Monteverde for her medications. Tr. 126. On November 21, 2002, Ragland saw Dr. Monteverde. Tr. 125. Dr. Monteverde noted, "Depression Resolved."

On February 23, 2005, Dr. Kankanala performed a disability determination examination. Tr. 183-185. On that day, Ragland reported she was taking Atenolol 50 mg once a day (used to treat angina and hypertension), Trazodone 100 mg once a day (antidepressant), Cardizem 120 mg once a day (used to treat hypertension and angina), Levoxyl 0.1 mg once a day (used to treat hypothyroidism), and Motrin on an "as needed" basis. Tr. 184. The physical examination was

unremarkable. Dr. Kankanala noted Ragland's range of motion was normal but that "the patient complained of pain." Tr. 185. Dr. Kankana assessed Ragland with mitral valve prolapse, hypothyroidism, generalized polyarthralgia, vertigo, generalized fatigue and **depression, under control.**

On February 5, 2004, Carl B. Adams, Ph.D., a psychologist, evaluated Ragland at the request of the Division of Vocational Rehabilitation. Tr. 168-173. Dr. Adams noted Ragland "did not present as significantly depressed or overly anxious." Tr. 169. Moreover, Dr. Adams opined Ragland was "an outgoing and responsive woman whose mood and affect were within normal limits." *Id.* Dr. Adams found Ragland to be oriented to time, place and person. Dr. Adams also found Ragland had average long- and short-term recall, intact insight, exhibited good judgment, was not paranoid or defensive, suicidal or delusional. Dr. Adams found no indication of a formal thought disorder. *Id.* Dr. Adams noted Ragland's job opportunities were limited in Eunice, but Ragland did not want to move since her home was paid for. Dr. Adam's administered several tests, concluding:

> Linda's Full Scale IQ score of 108 does not accurately represent her Verbal abilities. Her Verbal IQ of 116 places her in the superior range of intelligence at the 2nd standard deviation when compared with the general population. She has very good verbal skills, is intelligent, can reason quite well and can appreciate cause/effect relationships. Her performance IQ score of 97 is in the average range. The difference between her Verbal and Performance IQ scores is statistically significant, however, her Full Scale IQ score of 108 places her in the middle to average range when compared with the general population. With a Verbal IQ score of 116, Linda would be able to complete most any academic program if she chose to pursue one.
>
> The MMPI and MCMI are valid. There are significant elevations on the Hypochondriasis, Depression and Hysteria scales of he MMPI as well as the Anxiety and Schizophrenia scales. The MCMI has significant elevations on Anxiety, Hypomania and Depression as well as the Avoidant and Passive/Aggressive Personality Disorder scales. Linda is experiencing moderate to severe emotional distress at this time. She is clearly not happy with the course of her life or her current station in life. She is not experiencing enough discomfort and is not

> distressed enough to make any significant changes, however. She does not want to live anywhere other than Eunice as her home is paid for and she is secure to some extent. She can find herself unusually cheerful or euphoric ant times but within a short period of time could also find herself discouraged and fairly despondent. She is not sue what she wants to do with the rest of her life.

Tr. 172. Dr. Adams diagnosed Ragland with dysthmic disorder, rule out major depression, rule out borderline personality disorder and rule out dependent personality disorder. *Id.* Dr. Adams found Ragland was experiencing mild "psychosocial and environmental stressors" and assigned a Global Assessment of Functioning score of 80. Dr. Adams opined Ragland was "not a candidate for outpatient psychotherapy or psychotropic medications." Tr. 173.

Based on the medical records before the ALJ, the Court finds that the ALJ had sufficient medical evidence before him to view Ragland's condition(s) longitudinally. Accordingly, the ALJ did not err when he failed to supplement the record with the previous hearing record. Moreover, substantial evidence supports the ALJ's finding that Ragland was not disabled during the adjudicated period of time, i.e., February 17, 2000, to July 31, 2001.

## B. ALJ's Finding of Non-disability Through Date of Decision

Ragland contends the ALJ erred when he found she had "not been under a disability from February 17, 2000 through the date of this decision (August 24, 2007)." Tr. 21. Ragland argues that this ruling "effectively cut [her] off from any other Social Security benefits, including SSI." Br. Supp. Mot. To Remand at 10. At the administrative hearing Ragland's counsel requested the ALJ make a finding as to Ragland's current condition. Specifically, counsel stated:

Atty: Judge, and if I may, again I apologize profusely for this. If there's any way we could have a finding as to her condition now because I believe she is eligible– meets the non-medical eligibility requirements for SSI if she is disabled at this point. There is not an—

the, district office did not take an application because she told them she had two cares; one of which is up on blocks, it doesn't run, and the other is an old pickup, so–

ALJ: Well, well an application filed under Title XVI, of course, is an application for every program to which the claimant may be entitled, but the reverse is not true. <u>Without an SSI claim actually being filed that could be accelerated, I don't have any jurisdiction over that</u>. And I, I would assume that if the claimant is clearly disabled at, at this date regardless of what I do with this case, she would probably be allowed by DDS and, hopefully, on an expedited basis, but I just– I don't see how I can do that at this time.

Tr. 365-366 (emphasis added). Additionally, in the body of his decision, the ALJ noted:

> While the claimant experienced pain in the back, knees, neck, and back of head from February 2000 through July 2001, she testified that the pain did not seem to limit her as much then as it does now. She said that although she was previously hurting a lot, her pain has gotten worse. At the hearing, she was using a cane. During 1999 through 2003, the claimant attended classes at the New Mexico Junior College and earned an Associate's Degree. She took a maximum of 12 credits per term. <u>Although the claimant is probably currently disabled, she has not filed an SSI application but plans to do so soon. The overall evidence clearly indicates that the claimant was not disabled on or before July 31, 2001, the date her prescribed period ended</u>.

Tr. 19 (emphasis added). Nonetheless, the ALJ mistakenly found at the end of his decision that "The claimant has not been under a disability, as defined in the Social Security Act, from February 17, 2000 through the date of this decision." Tr. 21. However, the ALJ acknowledge that he had no jurisdiction to rule on whether Ragland was disabled and qualified for SSI benefits because she had not filed an application for SSI benefits. Accordingly, Ragland's assertion that the ALJ's ruling "effectively cut her off from any other Social Security benefits" is incorrect since the ALJ had no jurisdiction over any matter other than what was before him.

Next, Ragland contends the ALJ erred when he applied §202.13 of the Medical Vocational Guidelines because this rule is applicable only to persons below the age of 55 and she was over the age of 55. However, Ragland was 51 to 53 years old during the adjudicated period of time. Accordingly, the ALJ did not err in applying §202.13.

## C.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility. *Id.* The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

Ragland contends the ALJ improperly relied on her college attendance to find her not fully credible. Ragland argues the ALJ overstated her accomplishments, ignoring her testimony that it took her four years instead of two to complete her Associate's Degree. The Court disagrees. Ragland's college attendance was one of many factors the ALJ considered in finding Ragland not fully credible.

In his decision, the ALJ noted:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

> The claimant has symptom-producing medical problems, but her testimony and other evidence do not credibly establish functional limitations to the extent alleged. The record reflects that she has a history of mitral valve prolapse for which she takes Cardizem to manage any palpitations. On March 7, 2000, the claimant presented with pain in the left side of the chest but had no nausea or vomiting. On exam, she had good air entry and no wheezing. There was no murmur and both heart sounds were heard (Exhibit B-3F/4). The evidence further reveals that the claimant has not complained of any cardiac symptoms since the February 2001 work-up. At that time, she had normal coronaries and no mitral regurgitation was noted on exam. She underwent an electrocardiogram which was normal. Dr. Overlie indicated he had not seen the claimant in four or five years (Exhibit B-1F). On November 19, 2001, the claimant did not have any complaints of chest pain. Her lungs were clear with no wheezing, and no murmurs were noted (Exhibit B-3F/3). Progress notes dated May 5, 2003 reveal she was doing okay, had no complaints, and still unable to find a job (Exhibit B-3F/2).
>
> While the claimant had previous vascular problems, treatment notes show no evidence of peripheral vascular disease (Exhibit B-19F/7). She also has complaints of migraine headaches, hypertension, hypothyroidism, and arthritic pain (Exhibits B-3F; B-8F; B-11F; B-16F). Her problems with hypertension and thyroid disease, however, appear to be well managed with medications. In June 2004, her thyroid stimulating hormone (TSH) level was quite high at 7.34 and the thyroid replacement dose was increased (Exhibit B-8F/12). She takes Motrin as needed for arthritic pain, and takes no medications for migraines. At the February 2005 consultative examination, the claimant had no evidence of joint problems. She had good range of motion, good grip, and fist. The claimant had normal ambulation but refused to squat due to fear that the back would hurt (Exhibit B-6/F/3). X-rays of the right foot and ankle were essentially normal (Exhibit B-5F/2).

Tr. 18-19. The ALJ further cited to the evidence to support his credibility determination. *See*

Tr. 19-21. Thus, the ALJ set forth the specific evidence he relied on in evaluating Ragland's

credibility, and his credibility determination is supported by substantial evidence.

**D.  Conclusion**

The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's credibility determination and his finding of nondisability for the period of February 17, 2000 to July 31, 2000.  Accordingly, the ALJ's decision is affirmed.

A judgment is accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**